in 13-2072, United States v. David Salinas Acevedo. Counsel, could you address whether you think the court's general jury instruction was correct? No, I don't. I believe it was a very – I think it's the same exact instruction that was used in the Delgado case. And I don't, particularly after Eileen and the law that says that you have to have a specific finding by the jury beyond a reasonable doubt as to the quantity. And there's nothing in there. And I went through that in my brief, and there's nothing in the instructions. I quoted the instructions. There's nothing on the verdict form. But if there's a correct general beyond a reasonable doubt instruction, we normally think that a jury would understand, if it's a proper general instruction, that it would apply to each and every element. I mean, what troubles me here is that the court didn't give an each and every element instruction. It said that you must find the defendant guilty beyond a reasonable doubt, period. And I don't – I agree, Your Honor. I don't think that was enough. I just think – and again, it wasn't enough. I don't think it would ordinarily be enough when you have another issue, and particularly in the post-Eileen days where now you have to have – particularly where minimum mandatory applies and on the quantity of drug requirements. And for the life of me, I can't remember the case now. But where there has to be a specific finding beyond a reasonable doubt, no, I don't believe that instruction is correct anymore. And this is exactly the type of case that it did happen, and it wasn't challenged. Now, Eileen was decided after the trial, so that's why I'm at a plain error issue because counsel couldn't have raised it if he wanted to. I guess he could have, had he been able to foresee, and probably should have tried to anticipate that. But counsel, I think in part Judge Thompson's point is that the general instruction may have been deficient under any circumstances whether Eileen had been decided or not because it did not mention the responsibility of the jury to find, with respect to each element, beyond a reasonable doubt. Yes. I understand that, and I agree with that. But it would have been a basis for an objection even pre-Eileen because the instruction had the deficiency that Judge Thompson noted. We've been objecting – defense counsel have been objecting under Apprendi for years and arguing, and it was rejected for many years. And then Blakely was decided, and then Booker came along, and now we have Eileen. And then the courts would rely on Harris, and now that's been reversed. So clearly I believe the jury instructions were incorrect. With regard to the drug quantity, and although a somewhat more novel argument I have to concede, I think an absolutely correct argument on the 924C1C, which is the enhancement for the prior conviction. There is a bill, and I thought of submitting it under 28J, but it's just a bill, so I really don't know how much authority it is, where Congress is trying to fix that. They're now saying in order to get that bump in the enhancement, you actually have to have had the sentence imposed prior to the second conviction to avoid exactly this where you have one trial and five convictions. Now, had the jury been properly instructed, I respectfully submit, very confused as to what they were supposed to do. Is this a prior conviction when all the cases are being charged in the same indictment at the same trial? We just found him guilty. Is that a prior conviction for count five when he just got convicted of count one in this particular trial? A reasonable jury could have found no, had they been properly instructed, and they weren't. And that was raised, at least at sentencing. It was raised as part of, and the solution, of course, would have been to go on a default, basically go back to five-year minimum mandatory for each count and not to 25 years. In addition, I've argued as well under the rule of lenity that in terms of the gun enhancements, 924C is both a sentencing enhancement, and I've seen cases from this court, although I didn't say them, that the government could file a 924C on its own independently, I believe. Or the court may find out that it has to be filed with a drug. But I believe, and I've seen it, I think I've seen it, where the government files 924C on its own. And if that's the case, and then they find a 924C second conviction, certainly that's an essential element of the offense. And so that should have been alleged in the indictment, and it should have been, the jury should have been instructed. It didn't happen here. At sentencing, the objection was raised. It couldn't be raised, or it wasn't raised, because it had not been decided. So under the rule of lenity, I would respectfully submit that the court should apply that and find that the instructions here were not correct. Also, there is the argument that Judge Scalia, I believe in Amandares-Torres itself, argued that when a court is reviewing a rule or a statute and examining the statute can make a finding that has questionable constitutionality, that the statute is doubtful that the statute is constitutional, or make a finding that clearly would be constitutional, that the court has a duty to go with the constitutional finding and not basically allow for a case that would be doubtful whether the way that the law and the rule is being applied is constitutional. Counsel, would you spend some time on the sentencing factor, the sentencing manipulation argument, please? Yes, Your Honor. And before I forget, I'll start with that. One of the arguments I've also raised is that there was no actual oral or written finding by the court. And under Gall and the case law, whenever there's a sentencing, in order for this court to review the sentencing at an issue to determine is it reasonable, and that's what the standard is at any sentencing issue raised on appeal, is it reasonable, there has to be some finding by the court, whether it be orally on the transcript or written. There is none here. The sentencing manipulation. Sir, what finding is lacking here? What are you looking for? The issue was raised regarding the sentencing manipulation, I believe, with the government argument. Oh, so you're talking about a finding that addresses a sentencing manipulation argument. Yes. I apologize, Judge. That's what I was referring to. The issue was raised. The judge heard it. The government responded. And then the court just went to impose the minimum mandatory sentences, never addressed the sentencing manipulation issue. There was no written order. There was no oral finding. Your burden, as I believe and as I understand the law on appeal, is to determine was this a reasonable sentence. That's one issue that you have to determine. And how are you going to do that if you have the court never explained it? It just went ahead and said it. That's really a procedural and reasonableness argument. Is that correct? The failure to address an issue that was raised. Yes, Your Honor. Okay. Now, with regard to the sentencing manipulation, again, the government has conceded in its briefs, and, again, there's a lot of overlap. This was in this particular appeal. The government conceded that they, in fact, set the amount of drugs to be over the 10-year minimum mandatory in each case. And the reason that they said it was supposedly to make the drug transactions realistic. But the same agent, the case agent, testified that people who provide security have nothing to do with the drug quantity. So they could have been providing security, been told, come over. You're providing a drug deal security. They don't have to be told the amount of drugs involved at all. That was all for show. And it was for the purpose, I respectfully submit, to ensure that each one of these defendants was going to face a 10-year minimum mandatory sentence and for leverage at the time of plea bargaining. And it worked. Most of these people did wind up pleading. And they had this gun pointed at their head, like Mr. Herrera-Roberto. Either you take our deal and plead guilty, or you go to trial and face 100-and-something years in prison, possibly, depending on how many transactions you participated in. And they conceded. They set the amount. There was no reason to go there, based on what their own agent's testimony. He also testified as to the value of the drugs on the street, a kilo being between $20,000 and $25,000. So a two- or three- or four-kilo deal would be worth almost $100,000. It would not be unreasonable to have security for that type of a drug transaction. But how do you deal with the argument about your client's eagerness to do these deals, his willingness, in fact, his offer to find other people, his offer to get other firearms involved? I mean, that and if entrapment is a fair analogy, that suggests a strong predisposition to do all these deals. So how do you get around that? The law on sentencing manipulation is certainly that predisposition is a factor that the court should consider. It is not the controlling factor. The purpose of sentencing manipulation is to look at what the government's behavior was and how their behavior was calculated to take a crime committed by a probably guilty person and make it into a much larger situation, which is exactly what happened. This is the poster child of sentencing manipulation, 160-something years. May I ask, Counsel, in a traditional entrapment situation, the predisposition, you cannot establish really the absence of the predisposition. That really sort of kills you on that issue. You're saying that on sentencing manipulation that is not true. The case law in this circuit is that while the court can consider it and should consider it, it is not controlling. What the court focuses on is the government's behavior. In my brief, I specifically said we're talking about sentencing manipulation. I didn't argue entrapment. There's no way to argue that in this case. I'm not suggesting that Mr. Rivera-Ruperto was not predisposed and perfectly willing to come get his $2,000 for 30 minutes' work. But I don't believe that controls. I believe when you look at the overall what happened here and what the government did and the result, 160, it's, again, a classic case for sentencing manipulation. I appreciate the court's patience. May I ask one more question? Sure. But the fact is, despite the exposure of your client, the government in entering into plea deals was willing to offer a 12-year deal, I guess one up to 18 or 20. So is that willingness of the government to enter into plea deals that are vastly different than the sentencing exposure, is that relevant to the sentencing manipulation analysis in your view? Is it part of the totality of the circumstances that we should look at? I think it is, but not in the way that Your Honor is probably suggesting. I think after Lafleur and Frye, I think the court is going to have to look at it, and I think the Supreme Court already is. I read an interesting article questioning at the Supreme Court on the Bond case and Yates case and Johnson case, where the justices are somewhat concerned given the now, well, the way defense counsel, the obligations that we have during plea negotiations, that the government's ability to charge these and set these cases up this way, they're very concerned that defense counsel really has no choice and they're not being given a choice. So, yes, I think it is relevant. But, no, I don't think it lets them off the hook. I think the fact that they're willing to go for 12 years on a first-time offender on a case that involved no drugs, nobody got hurt, you know, he should have took the deal, no doubt about it, particularly when we look in retrospect. But, no, I don't think it changes the argument. And it could have been, and if the court finds malignation and sends it back for a different judge is what I've asked for and I've explained why, I think he might get a far more reasonable sentence that might be more in line. This was grossly disproportionate when you look at what he did. So I'm asking for fairness in that regard. I thank you again for your patience. Thank you. Fernandez, good morning. Good morning, Your Honors. Ignacio Fernandez on behalf of Defendant David Salinas Acevedo. With the court's permission, I would like to reserve two minutes for rebuttal. Okay. I think at the end of the day, when everything is said and done, this court is going to have to struggle with two questions. First one is whether or not my client would have committed this crime or any crime had it not been for the government's manufacture of this transaction. The district court had no trouble, in my view, determining that Mr. Salinas had no predisposition to commit this crime. The second question that this court will have to struggle with is the reason why Mr. Salinas was targeted in the first place. Mr. Salinas was in no one's radar screen until he told Camacho, who was the government's agent, that he had financial troubles because his wife was pregnant. He was expecting a child and he needed a second job. Everything started from that moment on. Once Camacho, the government's agent, found out that Salinas was in that situation, that's when he began his push to recruit Salinas. And he did his work through Ruyang. Camacho asked Ruyang to recruit Salinas for the first time, and Salinas refuses. He uses a polite way of refusing, saying, listen, I have a situation with my girls. I don't really want to, I can't make it. I don't want to get involved, et cetera. Isn't that just a timing issue? It wasn't a good time for him to participate. That doesn't mean that he's rejecting the notion. Well, the evidence on an entrapment defense, the evidence, I'm so sorry, the evidence has to be seen in a light most favorable to the defendant. And this court has said that raising calendar issues or conflicts like that may be a polite way of declining to participate. I cited that case in my brief. And as a matter of fact, in that telephone call, Ruyang tells Camacho that he did not believe my client, that he thought my client was just making up excuses so he wouldn't have to participate in that transaction. So I would pause at this moment and say, why did the government allow Camacho to keep going after Salinas once he rejected the first proposal? I think that's the first, I think that's an issue that this court should deal with. In my view, Camacho was thrown out to the streets without any supervision, without any guidance, and just saying, just trying to get as many people as he could within his net. When Ruyang tells Camacho for the first time that Salinas is not able to, or is not willing to participate in the transaction, then Camacho approaches a second individual, Mendez-Perez, to try to get Salinas involved. Now, there is very conflicting testimony as to whether or not Mendez-Perez actually spoke with Salinas. But to me, that's irrelevant to my argument because it shows Camacho's intent to go after Salinas no matter what. Finally, yes, Your Honor. In that conversation, didn't Camacho tell Mendez-Perez, this isn't compulsory, this is for those who want to and know what it is? Yes, actually, and that is the reason why the district court reversed itself when it had actually at first allowed the entrapment defense. And based on that statement that Your Honor made, it then reversed itself. And I would argue the contrary. I mean, if you go to the transcript when that conversation happened, a few other things happened after Camacho made that statement. After Camacho made that statement, he again tells Mendez-Perez, as soon as he was leaving, listen, don't forget about Salinas. Make sure you talk to Salinas. And if he gives you any trouble, bring him over to talk to me, meaning Camacho. So although Camacho did say that to Mendez-Perez, his actions, he was doing something else. For example, he told that to Mendez-Perez, but he then pushed Mendez-Perez and reminded him to get in touch with Salinas. Then at the same time, he was making telephone calls to Ruyan to try to get Salinas involved into the transaction. So the fact that he did say, you know, that snippet, that thing he did say, I don't think that voids the entrapment defense at all. What takes this case out of the category of just giving your client an opportunity to do something illegal? I mean, what is overbearing, inappropriate about the government's conduct that would support even instructing on an entrapment defense? Again, it just seems like putting the temptation in front of your client. Yes, they know he was in difficult financial circumstances, and it's troubling that they would perhaps seek somebody out who's vulnerable. But what takes it beyond the threshold of something? Well, to me, Your Honor, that is improper. And let me say why. Let's compare Ruyan with my client. Why was Ruyan targeted? Ruyan was targeted because he would boast at the police station that he had all these contacts in the underground, that he could get drugs, he could get guns, that he was just a criminal with a uniform. And that's why Camacho targeted Ruyan. On the other hand, Salinas was targeted because Camacho knew that he was desperate, that he was looking for a second job, that he was under pressure. I mean, there is a huge difference between the two. And I think approaching an individual, a law-abiding individual who is going through a vulnerable period, I think that's improper. Because otherwise, Your Honor, I mean, it's open season on all of us. I mean, can the government go after me just because they feel like it? Can the government go after Your Honor because they want to catch a judge? But where's the arm-twisting? Yes, your client was in a vulnerable position financially, but where was the government's arm-twisting of your client? The insistence. The insistence of committing the crime. The offer to let him be a part. Well, I would say more. I would say the insistence. I mean, Camacho, if you – I said it in my brief. I mean, Camacho was very adamant to Ruyang that he had to put pressure on Salinas to get him to do that deal. For example, right prior to the deal, Camacho tells Ruyang, listen, make sure Salinas shows up. I don't want to cancel the deal again like last time. That's it. Thank you. Thank you, Your Honor. Good morning again, Your Honors. May it please the Court. Robert Heberle again on behalf of the United States. Your Honors, I'd like to begin by addressing one of the first things that counsel for Mr. Rivera-Ruperto brought up in this appeal, which is the Allain error issue with respect to the jury instructions. Just to clarify the issues before the Court, as I understand from the briefing, that particular claim is not before the Court in this appeal, but rather in the other previously argued appeal. It is in this appeal that Mr. Rivera-Ruperto claims that there was Allain error with respect to the 924C subsequent or conviction claim only. But I would like to address briefly the drug quantity Allain issue because that was discussed by my colleague. In particular, with respect to the jury instructions in this case, whether it was adequately expressed to the jury that the jury had to find guilt in the elements of the offense beyond a reasonable doubt, I would direct the Court's attention to the jury instruction transcript. This is document 648 in case 310CR344 at pages 107 through 109, where the Court expressly instructed the jury not only that there was a presumption of innocence in the case, but also that the jury had to find guilt beyond a reasonable doubt. At no point in the instructions was the jury told that there was any lesser standard of proof that it could apply to any of the disputed factual findings in the case. And then after that general instruction is beyond a reasonable doubt, the jury was told again that it must find all the elements, or excuse me,  all the elements as to each of those offenses. So, for example, at page 115 to 116 of the same transcript, in instructing the jury with respect to the conspiracy charge, the Court stated, for you to find each defendant guilty of a conspiracy, you must be convinced that the government has proved each of the following things beyond a reasonable doubt. And then proceeded to list the core elements. First, the agreement specified the indictment and not some other agreement or agreements existed between at least two people to possess the intent to distribute a controlled substance. And the second element, that a defendant willfully joined that agreement. It's only later that the District Court says, after you've made that determination, you will need to make drug quantity findings. So the jury is instructed as to beyond a reasonable doubt twice. Once generally at the beginning of the instructions, and then once when each offense is separately defined for the jury when the Court says, you must find these elements beyond a reasonable doubt. And that situation is directly analogous, directly on point with what this Court ruled in the Dickerson case. What did the Court say about drug quantity? What the Court said about drug quantity, Your Honor, for... For example, Your Honor, at pages 122 to 123, the Court, after defining the elements of the offense, stated, if you find that the defendant conspired or attempted to possess with intent to distribute a controlled substance, you will also be asked to, you will also be asked to, also make findings as to the quantity of this substance that the defendant either conspired or attempted to possess. So what is lacking in those instructions is an express statement by the Court, you must make this additional finding also beyond a reasonable doubt. That was the exact claim that was brought before this Court in Dickerson, an Apprendi claim stating the jury was told beyond a reasonable doubt applied generally, and beyond a reasonable doubt applied to all the core elements of the offense. But the District Court forgot to tell the jury that with respect to this one finding as to quantity, it had to make that finding beyond a reasonable doubt. And what this Court said was, there is no way that the jury, in being instructed repeatedly as to beyond a reasonable doubt, somehow applied some lesser standard of proof to the quantity findings. And this Court in Dickerson found that there was no error, much less plain error, in instructions that are, as far as we can tell from the Dickerson opinion, very, very close to the instructions that were given in this case. Can I ask you a question? Yes, Your Honor. Unrelated to your present argument, is there a federal crime for corruption by state officials? Yes, Your Honor, there is. And isn't that what these policemen were engaged in, other than the fact that they were charged otherwise? Well, Your Honor, I haven't conducted that analysis myself. That's obviously as to whether someone has committed a violation of the Federal Program Bribery Statute, Section 666, to which I believe the Court is referring. It requires a careful inquiry not only into whether there's some sort of quid pro quo bribery or jurisdictional elements of that offense are met. And I just simply haven't conducted that analysis before this argument, Your Honor, so I can't speak directly to that point. But certainly in this case, what was charged, there was sufficient evidence to establish those offenses, and the jury found each of them to be guilty of all those offenses beyond a reasonable doubt. Well, because what's been bothering me about this case is that everything is false. It's charged. I mean, the dealers are false. The drugs are false. Everything is false. But the government chooses a crime which allows them to manipulate a lot of things. What's really involved is not the drug dealing. What's really involved is the corruption by the officials. So I wonder why they didn't charge him with that rather than the conspiracy charges, which allows the government to engage in what I think is somewhat questionable conduct because it allows multiplication of the sentences. And we end up with what I think is a totally absurd sentence of 160 some years. Yes, Your Honor, I'd be happy to address that. I think that one of this Court's cases in particular, which we've cited in our brief, is very applicable in these circumstances. And that is the case of United States v. Polk, in which this Court addressed an Eighth Amendment argument by an individual who was convicted as the result of a child pornography sting operation. And that individual said, this is not a completed crime. This is an attempt. And not only is it an attempt, this is a case that involves an undercover officer. There was never even a child involved. So how can I be subject to these large mandatory minimum penalties? This is cruel and unusual punishment and it's grossly disproportionate. And what this Court said in Polk was that when you look at the difference between an attempt crime and a completed crime, Congress has made the determination, which is subject to deference, that these two crimes involve roughly the same level of culpability. And this Court determined that there is little, if any, difference between the culpability of a defendant who attempts a crime and the culpability of a defendant who completes the crime. And the Court said the same thing with respect to the undercover operation. As I remember the Court's opinion in Polk, the Court said the defendant's mistake of fact, the fact that he thought he was talking to a child but he was really talking to an undercover officer, does not affect, or if it does affect, has very little, if any, effect and therefore can't tip the Eighth Amendment balance in his favor on the defendant's culpability. And so with respect to these defendants, what they were doing, I would submit, is directly what was charged. They were conspiring with others to possess cocaine. And they were attempting to possess cocaine. And they were possessing firearms in furtherance and during that offense. And so what the government charged was the charges that appeared most directly on point, given the conduct that was at issue. And these defendants should be held responsible for their culpable, for their mental states, for what they believed was going on, for what they did, especially in Mr. Rivera-Ruperto's case, repeatedly over and over and over and over and over again. Thinking that these were large drug deals involving significant quantities of cocaine and not only doing that, but bringing firearms to these transactions, knowing that they were required to provide security, operational firearms. In Mr. Rivera-Ruperto's case, even offering to obtain weapons for the conspiracy and then when they offered to take him up on that, he actually ended up providing a gun with an obliterated serial number. So I do believe in this case those charges were warranted, Your Honor. Counsel, do you agree that the, whereas if this were a, an entrapment issue that the predisposition of the appellant would be fatal to any entrapment defense, and we're talking about sentencing factor manipulation, it is just one of multiple factors to consider in the analysis and that, here at least, it's the conduct of the government that should be the primary focus of the court's analysis? I agree with part of that statement, but not all of it, Your Honor, and I'll explain. I think the primary factor is indeed the government's conduct and the government has to have engaged in, as I stated before, outrageous or intolerable conduct. There must be something beyond just inducement in the case. But this court has also recognized, similar to the entrapment context, that someone's predisposition not only is relevant to the analysis, but also can even overcome a finding of government impropriety. And I would point the court, in particular, to the case of West v. United States, which is 631 F3rd 570-71. It's a case this court issued in 2011, where this case noted, or where this court noted that the defendant's predisposition to commit the charged crimes is a secondary consideration in the sentencing factor manipulation. But that secondary consideration may overcome even a finding of improper motive. And in this case, Your Honor, even if the court were to find some sort of improper, outrageous government conduct, which we submit is absent, the court would still need to confront the fact that Mr. Rivera-Ruperto was extraordinarily eager to engage in these crimes. Not only himself, but also to recruit others for the crimes and to bring weapons into the conspiracy. And in fact, he even actually did bring one weapon and sold it to the purported drug dealers for, I believe, $1,200. Now, maybe I can anticipate your answer, but how would you factor into our analysis the, despite the sentencing exposure, the plea deals that the government was prepared to offer, which obviously were far less than the sentencing exposure, how should that factor into the analysis? I don't believe that there's any authority on point that would indicate that the government's previous plea offer should factor into a sentencing factor manipulation analysis, Your Honor. The defendant has not pointed to any authority to that effect. I'm not aware of any authority to that effect. What this court has said is that what matters most is government impropriety. Is there some sort of outrageous or intolerable conduct in actually executing the undercover operation? And here, I think it's important for the court to recognize that the parameters of this operation did not change while Mr. Rivera-Ruperto was participating in it. The parameters stayed the same. The government didn't try to lure him into executing some sort of additional crime that he hadn't done before, to working with even larger amounts of cocaine, to doing something beyond what he did in the first transaction. He did the same thing over and over and over and over again. He knew exactly what he was getting into, and he did it repeatedly and knowingly. And he was charged with 924C offenses as a result of that conduct. Congress has made the determination that when someone uses a gun in relation to or in furtherance of a drug trafficking crime, that's a very serious offense. And when someone is a recidivist, it's even more serious. And we cited in our brief in this case numerous opinions from numerous circuits in which courts have held that determination by Congress is entitled to deference and have upheld that statute, that recidivist penalty, against an Eighth Amendment challenge. When you have an indictment like this with multiple 924C charges, is it the government's position, and is it the law so far as you understand it, that each count successive to the original count qualifies as a second offense? And so the mandatory consecutive consequences come into play, even though we're talking about one indictment and convictions that all take place at the same time? Yes, Your Honor, that is our position, and we also believe it is the law. That where there are separate instances, even though they're charged in the same indictment, where someone brings a gun to a separate transaction, and in this case, each time with separate, it was a separate number of individuals, or excuse me, different individuals were involved in each transaction, because Mr. Rivera Ruperto would bring someone different to each one of these things. That each one of those counts as a separate transaction, and each one of them counts as a violation of Section 924C, because Mr. Rivera Ruperto in each instance is possessing a firearm in furtherance of an attempt to possess cocaine. And each one of those transactions is a separate attempt to possess with intent to distribute a large quantity of cocaine. And Your Honors, I also believe there was a brief discussion as to the reasons why the government selected this particular quantity of drugs in this case. And something that my colleague said in his argument was that well, the government had testimony at trial, and there was no reason for this other than the mandatory minimum. And he also mentioned, well, there was some reason because the government believed this was necessary to make the transaction seem realistic. I do think that that bears emphasizing the latter point. There was direct testimony in the record by an FBI agent that this particular quantity of drugs was selected because this transaction needed to look believable. The primary factor, he testified, in developing an undercover operation is to develop a believable scenario, because otherwise the undercover operation won't work. And so what the FBI did in this case was they used a quantity of drugs that would be sufficient to merit the kind of security, the kind of operation that took place, the number of individuals involved that would merit having people go out and try to recruit other people. And that's direct record evidence to that point. Given the fact that the appellant has the burden of producing by a preponderance of the evidence a case of sentencing factor manipulation, the presence of affirmative evidence in the record by the government rebutting that claim is noteworthy. And unless the court has any further questions at this time on Mr. Rivera-Riperto, I'd like to spend a few minutes talking about Mr. Salinas Acevedo's appeal. Mr. Salinas Acevedo. Can I just, just very quickly, I gather to the extent that we may find that this sentence is extraordinary, it's all the defendant's fault. Is that the bottom line, that he could have avoided this, he had an opportunity to avoid it, he didn't, and now that he will be serving a life sentence of 161 years, it's all his fault, and that's just the way it worked out. Is that your position? Yes, Your Honor, it is. The defendant had six opportunities to say no, and every single time he said yes. And he did the same thing over and over again, knowing exactly what would be involved. He was a very eager participant, he recruited others, he sold a firearm to the conspirators. This was not someone who was hesitant or not sure or uncertain about his conduct. He brought a firearm to each of these transactions, knowing that he was providing security for what he believed to be a significant cocaine transaction. And he was properly charged for the crimes that he was charged with, and properly held responsible for them. As to his Lafler claim, he was also properly advised, and I mentioned this to the Court earlier, but I couldn't find the citation, I apologize for that. His attorney did in fact advise the Justice Department attorneys of the fact that he did wish to plead guilty to the 12-year offer, but that was after the offer was off the table, and that was at pages 98 and 104. But to the larger point Your Honor brought up, the attorney's testimony at the Lafler hearing, which the District Court found credible, was that he in fact had advised his client fully as to the potential consequences of not pleading guilty. He had told him about the consecutive 924C penalties in particular. And his client, over and over again, each of these five different plea opportunities that was discussed in the Lafler hearing, said, no, it's too much. Eight years is all I'll do, or 13 years is all I'll do. And so there was always this mismatch between what the defendant was willing to accept, even after being fully counseled of the consequences, and what the government was prepared to offer at that time. Could you illuminate me as to whether there are any other sentences similar to this anywhere in the United States? Yes, Your Honor. In fact, I don't have the page with me, I apologize, but in our brief we do have a fairly long string cite of other cases in which courts have upheld 924C convictions, involving a number of consecutive or subsequent 924C convictions, against an Eighth Amendment challenge. And as the appellant points out, well, I'm interested in the amount of the sentence. I don't have that. The length of the sentence. As I recall, Your Honor, these range from several decades to over 100 years in some of these cases. I would have to check the brief, and I'm happy to do that now if you'd like me to, to see what exactly the sentences were. Write a letter. Okay, yes, Your Honor, we're happy to do that. Thank you. I guess what Judge Lopez was trying to ask, at least, when we're looking at the primary element, which is, what was the government's motive, and how did the government behave? When you look at the plea offers, they seem so disproportionate to the amount of time that was conceivably possible for these defendants. So should we look at the we're trying to figure out if we should look at the offers relative to whether the government itself thought that it had misbehaved somehow. I don't believe there's any authority suggesting that the court takes plea offers into consideration in sentencing factor manipulation cases, Your Honor. Certainly the appellant hasn't cited anything to that effect. And I don't think it's relevant under this court's case law because what this court has said is, what matters is, what did the government do in designing the operation? This is why we've been talking about how it's analogous to entrapment. Did the government overbear someone's will and cause them to engage in an offense that they wouldn't otherwise have engaged in? That's the focus of a sentencing factor manipulation claim. That is, did the government manipulate the operation itself to cause additional crimes that wouldn't have otherwise occurred? Not, did the government offer a plea deal after the operation had concluded and then decide to go forward with the trial after which the defendant was duly convicted? I think that in this case, also, it bears mentioning that the government offered those plea deals at 12 years contingent upon the defendant accepting responsibility for his crimes, which he did not do. And that is a factor that's also relevant in determining what is an appropriate sentence in this case. But I don't believe that that's a factor that this court has considered in its prior sentencing factor manipulation cases. The focus is on how was the operation designed, what was the government's motivation, did it improperly induce someone, and was that person predisposed? Not, what was the plea offer and what was the ultimate sentence? And here, certainly, Mr. Rivera-Ruperto was extraordinarily disposed to commit these crimes. With respect to Mr. Salinas-Acevedo's arguments, I'm happy to answer any questions the court has. I see that I'm not seeing any questions with respect to that entrapment defense. Well, how do you respond to the argument that this exploitation of his vulnerability apparently revealed in just a chance conversation with a colleague should not allow the government to then go out of its way to exploit that vulnerability? This is not somehow, it goes beyond just a willingness to commit the crime. It's a willingness born of a certain desperation among life circumstances. That has the feeling of unfair exploitation. Why shouldn't that at least justify an instruction? Why not let the jury sort out an issue like that? Why doesn't that at least justify an instruction? That's all we're talking about here. Your Honor, I would point the court to the Gonzales-Perez case in which this court, in a guard shack case, faced a very similar claim by someone who went into great detail in his proffer about precisely what financial difficulties he was facing. And what this court said was it's not enough that someone has financial difficulties or that there's some sort of financial incentive to establish a basis for an entrapment instruction. Rather, what matters is did the government unfairly exploit that financial vulnerability? And the evidence that Mr. Salinas Acevedo proffered in this case is simply insufficient to establish any sort of unfair exploitation. Did he refuse two offers? It wasn't the third time that he actually went along with it. My understanding from the record, Your Honor, is that he declined to participate once. And that one time he declined to participate. Well, isn't that enough? No, Your Honor. To show that he wasn't inclined to engage in the conduct? No, Your Honor, I don't think so. And I would point the court again to the Gonzalez-Perez case in which the defendant actually proffered that he had received several phone calls from the middleman. And the middleman on several occasions had tried to get him to participate and several times he declined. And this court said it doesn't, what matters is not necessarily the number of times that someone declines to participate. It's how they're asked to participate. And in this case, he only declined once and there was no undue pressure placed on him at any point to participate. Well, isn't that something that should be decided? Even if it was only once, why shouldn't it be the jury that decides whether he was actually enthusiastic about it or just saying that for the record? Because it's not enough, as this court has said, Your Honor, for the defendant to have declined one time based on a scheduling issue and then readily accept later, about ten days later, to do the same thing that he first declined to do. What matters in terms of whether an entrapment instruction is justified is whether a reasonable jury could find, based on record evidence, that in fact someone was improperly induced to commit the crime and lacked predisposition to commit the crime. My recollection is that he refused two times and on the third time he accepted. What if it was two times? Would you say he was entitled to instruction? No, Your Honor, I wouldn't. How many times? Again, as this court stated in Gonzalez-Perez, it's not the number of times that's definitive. What matters is how was the person approached. And if you look at the record evidence, and it's very extensive in this case, we've cited it in our supplemental appendix, which contains all the transcripts, what you see over and over again is these middlemen reporting to the government agent Camacho that they're not pressuring him. And Camacho, in fact, instructing the middlemen, well, don't twist his arm. This is only for people who understand what it is. This isn't for people who don't know what's going on. And then, in fact, Mr. Camacho even at one point tells Mr. Rion, did you tell him what the devices are? And Rion responds, yes, I did. The transcript of the transaction itself shows again Mr. Rion, the middleman, saying over and over again, I told Mr. Salinas what was going on. I just didn't tell him that you were here. Salinas was under the impression, at least he says, that he was dealing with diamonds, not with drugs. A couple of points on that, Your Honor. First of all, Mr. Salinas conceded in his second proffer to the District Court on this issue on entrapment that he had no evidence by which he could attribute that claim regarding it being a diamond-related transaction to a government agent. So we concede that he, or we, I'm sorry, we allege that he has conceded that point in the District Court. He did not put forth any evidence by which a reasonable jury could conclude that even if the middleman had told him it was a diamond transaction, that was something the government induced the middleman to do. Which, as this Court said in Luisi, is necessary for a derivative entrapment claim such as the one that Mr. Acevedo, Salinas Acevedo raises. But second, Your Honor, the record evidence, in particular the transcript of the deal itself with Mr. Salinas Acevedo, conclusively disproves the idea that he didn't understand what was going on when he arrived at the apartment. In fact, over and over again, as I was just saying, Mr. Rion says, I told him what was going on. The reason why he's so surprised is that he didn't know that you, Mr. Camacho, were involved. Because apparently Mr. Camacho was an acquaintance of Mr. Salinas Acevedo. But Mr. Salinas Acevedo isn't surprised because this is a drug deal. He's been told exactly what's going on here. If the Court has no further questions, we respectfully ask that the District Court's judgment be affirmed. Thank you. Your Honor, perhaps I can save the government the trouble of that letter. If you look at the government's brief in this appeal 13-2017 at pages 67 to 68, that's the list of all these cases that I believe counsel is talking about that they cited around the country of other 924C sentences. And it's at page 25 of my reply brief. The distinction, and I'll be happy to review it very quickly, is in all these cases, they're real crimes. And they're really bad crimes. They're robberies, kidnappings, armed robberies, major drug deals. There's even a terrorist case involving an attempt to wage war against the United States where the person got a life sentence. And these sentences range all over the place, 58 years, 61 1⁄2 years. I'll be happy to review them. But they're at those pages for Your Honor. Do you say they're not sting cases? No. None of these cases are sting cases. These are all real cases. And that's the distinction. They argued this, you know, that's why 924, what they did was okay. There's a complete difference between the cases they cite. Although they provide the court in terms of the proportionality review under the Eighth Amendment, one of the factors you're supposed to review the cases in this district and the cases nationwide. I argued there were so many cases in the district, I didn't feel there was a nationwide analysis necessary. I guess I got lazy. The government did it for me because they did a review. Although they are not reviews of sting cases. These are all real cases. And I respectfully submit you cannot compare these type of cases that involve true crimes of violence with this case. Again, it's just so disproportional. And to me, again, the poster child for sentencing manipulation. I wanted to make sure I didn't mislead Judge Thompson because of this case is so confusing on the facts. I did not raise the jury drug issue in this 1317 case. I raised it in the other. My argument is basically altogether the sentencing manipulation argument applies. The disproportionality argument applies. And then on these specific cases, the jury instructions are faulty. And the 924C particularly on that second case. And in the first case 924C and the drugs I argued. My time is up. Again, I thank the Court and ask that you reverse and remand to a different judge for a new Lafler hearing and resentencing. Thank you. May it please the Court again. My brother for the government gave a lot of emphasis that this Court should look at how was the person approached. And I agree with that. In Salina's case, my client was approached because he was vulnerable. Because out of the conversation with a colleague, he told his colleague he asked for help in getting a second job. And the government used that conversation to target him to commit a crime that they manufactured that he otherwise would have never committed. Judge Torroya said that he was bothered that all these drugs were fake drugs and all manufactured by the government. I would urge this Court to also be bothered by the reason why Daviel Salinas was targeted in this case. I mean, it is absolutely unfair and I think the founding fathers would have a heart attack. Counsel, we're not dealing with lay people here. These are police officers who are entrusted with certain very important responsibilities and if the government is trying to determine which police officers cannot be trusted to carry out their responsibilities, which police officers are willing to abet the very criminal activity that they're supposed to prevent, it's a little hard to find fault for the government for trying to maybe go a little beyond the norm in trying to weed out police officers who are easily lured into criminal activity. That's a pretty important thing to find out. Well, it is, but Salinas wasn't easily lured. And that's one thing. And second, Camacho, may I continue? Yes. Camacho was the one who decided who to target. It really wasn't the government. I mean, Camacho knew about Salinas' troubles and he decided to go after Salinas. When Salinas declined the first time, he didn't go to the FBI and said, listen, should I continue working Salinas? He wasn't supervised. He wasn't trained. He was just left on his own devices to trap as many people as he could. There's one, if I may, just 10 seconds. When my brother also mentioned the issue of the devices, let me remind the court that Camacho said after he asked Ruyan about the devices, he's like, oh, my God, Salinas is going to jump out of the balcony when he finds out that these are drugs. So that tells you what they thought of Salinas, that he wasn't a man who was involved with drugs. Thank you, Your Honor.